# AFFIDAVIT IN SUPPORT OF
# A CRIMINAL COMPLAINT



Jul 13 2020

I, Alexander Laumb, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a U.S. Postal Inspector employed by the Seattle Division of the U.S. Postal Inspection Service, specifically in the Anchorage Domicile. I am a sworn Federal law enforcement officer empowered to investigate criminal activity involving or relating to the United States Postal Service and/or United States Mail. As part of my duties, I investigate incidents where the United States mail system is used in a fraudulent manner in violation of the following: 18 U.S.C. §§ 1028, 1028A, Identity Theft; § 513(a), Possessing Counterfeit Securities; § 1344, Bank Fraud; § 1029, Credit Card Fraud; § 371, Conspiracy; and § 1029, Fraud and Related Activity in Connection with Access Devices, among others. In that capacity, I have become familiar with the investigation and prosecution of bank fraud, identity theft, money laundering, mail fraud and access device fraud, including the use of various criminal methods to perpetrate these frauds.

2. I have been a U.S. Postal Inspector since August 2019. I attended and graduated from a three-month Basic Inspector Training (BIT) academy operated by the United States Postal Inspection Service (USPIS) in November 2019. While attending the BIT academy, I received training and instruction on investigating federal crimes that use the U.S. Mail including but not limited to the sending of illegal drugs through the U.S. Mail, robbery and burglary of postal facilities, destruction of government property, theft of U.S. Mail, possession of stolen U.S. Mail, mail and bank fraud, identity theft, and counterfeit

personal checks and identifications. In an extension of BIT training, and subsequent to graduation from BIT academy, I received several months of additional training and instruction under the tutelage and supervision of senior Postal Inspectors. I have conducted and/or participated in numerous investigations relating to mail theft and identity theft.

3. Prior to my employment with the USPIS, I was employed for nine years by the Washington National Guard Counterdrug Program as a Criminal Analyst. From 2010 to 2015, I was assigned to the Tri-City Metro Drug Task Force in Kennewick, WA and the Snohomish Regional Drug Task Force in Everett, WA. In 2016 I deployed in support of Special Operations Joint Interagency Task Force – Operation Inherent Resolve (SOJTF-OIR). Upon my return I was assigned to the Western Regional Counterdrug Training Center as the Threat Finance Senior Instructor and Branch Chief for Law Enforcement Support instruction from 2017 to 2019. In May 2009 I received a bachelor's degree in Political Science from Pacific Lutheran University in Tacoma, WA.

4. Based on my training and experience from investigations and consultation with other law enforcement officers regarding various counterfeit access device investigations, I am aware that fraudulent and counterfeited credit card schemes involve a number of component activities consisting of:

   a. The illegal obtaining of/and trafficking in valid credit card account numbers, primarily Visa, MasterCard, and American Express credit card account numbers. The locations where these numbers are illegally obtained are commonly referred to as "points of compromise."

Affidavit
3:20-mj-373-MMS

Page 2 of 15

Case 3:20-mj-00373-MMS   Document 1-1   Filed 07/13/20   Page 2 of 15



Jul 13 2020

b. At these "points of compromise," individuals intending to capture unauthorized credit card numbers use electronic devices commonly referred to as "skimmers" to capture credit card track data from legitimate credit card holders. These unauthorized credit card account numbers are later encoded and embossed onto counterfeit credit cards. Those individuals "skimming" commonly work at restaurants, gas stations and other stores where customers give their credit card to a cashier. Without the customer's knowledge and authorization, their credit card will be swiped with the skimmer. Information needed to counterfeit that credit card will thus be illegally obtained. In this way, skimmers' primary use is to capture data as the first step in the process of making counterfeit access devices.

c. The individual who captures legitimate credit card information onto a skimmer may take that information and download it onto a computer to manufacture counterfeit credit cards or take it to someone who has the capability to do so. This "front-line" person often gets paid according to how many numbers they have captured on the skimmer.

d. The number of "traffickers" between the front-line person and the counterfeit credit card manufacturer can vary. Usually each trafficker will be paid an increasing amount per credit card number on the skimmer until the skimmer is delivered to the credit card manufacturer.



Sometimes, traffickers will receive counterfeit credit cards in addition to or in lieu of payment for the numbers.

e. Once the fraudulent or counterfeit credit cards are printed, they can be sold, used personally by the manufacturer, given to conspirators as payment for illegally obtaining numbers, or given to "shoppers." Shoppers are individuals who illegally use the cards to buy high-dollar items such as electronics, gift certificates or gift cards, or other items such as jewelry that have resale value. These items may be returned to the manufacturer or sold so that part of the proceeds is returned to the manufacturer.

f. In order to effectively "skim" a debit card, the skimmer must also observe the debit card holder input the card's PIN number so that when the debit card is subsequently used fraudulently, the skimmer or co-schemer will be able to access the debit card funds. These PIN numbers are typically recorded somehow. In a recent investigation I learned that people using skimmers keyed PIN numbers into mobile telephones and stored them therein.

g. I have seen numerous skimming devices. They range in various sizes. They are typically rectangular in shape and small enough to be hidden in the palm of a hand.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is

Affidavit
3:20-mj-373-MMS
Page 4 of 15

Case 3:20-mj-00373-MMS   Document 1-1   Filed 07/13/20   Page 4 of 15


Jul 13 2020

intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

6. On February 4, 2020, Postal Inspectors identified Priority Mail Express Parcel EJ130094106US (herein after referred to as Subject Parcel) addressed to "Catalin Zamoff Valley Hotel 606 S. Alaska, ST Palmer, Alaska 99645" from "Markus Roshu 1345 Cabrilo Park, Dr #A16, Santa Ana 92701" as being suspicious by utilizing postal databases.

7. On February 5, 2020, a Federal Search Warrant was applied for and granted by a United States Magistrate Judge for **the Subject Parcel**.

8. On February 5, 2020, the Federal Search Warrant was executed on the Subject Parcel. The Subject Parcel was found to contain approximately 555 gold magnetic strip cards bundled into groups using masking tape. The magnetic strip cards each had a different financial institution written on the front of the card and four digits assumed to be the pin number to the associated account. Based upon my training and experience I identified the magnetic strip cards as most likely being fraudulent and containing stolen bank data.

9. On February 6, 2020 Inspectors were informed of an Alaska State Trooper (AST) case of ATM fraud that had been occurring against credit unions located in the Matanuska Valley since August 2019. Troopers had photos and ATM withdrawal history from a suspect, but they did not have any positive identification. Inspectors received post



office photos of the mailer of **the Subject Parcel,** the photos could not verify the identity of the AST suspect.

10. On February 15, 2020 Inspectors were informed by postal employees that a "Catanin Zanoff" had contacted USPS regarding **the Subject Parcel** using phone number "(404) 382-8939." A search of "CLEAR" (a law enforcement intelligence clearinghouse) for "404-382-8939" did not associate the phone to "Catanin Zanoff." A search of "CLEAR" for "Catanin Zanoff" did not provide any results. The data provided by "CLEAR" is a combination of over 33 billion records from over 8,800 different data sources which are updated daily, weekly, monthly, and annually, depending on the particular data source.

11. Beginning on February 18, 2020 Inspectors photographed and processed the account data from the magnetic strip on each card utilizing a commercial credit card reader. Each financial institution and account was identified based upon the Bank Identification Number (BIN) encoded on the magnetic strip. Over 70 financial institutions operating in southern California were identified with approximately 500 distinct accounts being affected. Inspectors continued to process the magnetic strip cards over the next three weeks identifying any cards that the BIN did not match the written financial institution, any duplicate cards, and any cards whose data failed to process. In total 555 cards were scanned with approximately 500 accounts identified.

12. On March 12, 2020 I began contacting the credit unions identified on the fraudulent card's magnetic strips to: confirm that the accounts were associated to the financial institution, if the cards were currently active, and to inform the financial



institution that their customers may be the victims of fraudulent activity. Follow-up e-mails and verbal communications were sent to ascertain if any fraudulent activity had already been reported against the account including losses suffered by the financial institution. Credit unions in southern California identified Matanuska Valley Federal Credit Union (MVFCU) as being one of the Alaskan locations for the fraudulent transactions. Inspectors contacted MVFCU who provided their ATM fraud investigation report showing their total ATM fraud losses as of March 4, 2020 at $103,544.66. I compared MVFCU's losses to the recovered magnetic strip cards and identified $17,089 directly associated to the accounts stored on the magnetic strip cards.

13. On March 12, 2020 I reviewed postal databases and information gained from export data to identify the suspected mailer of **the Subject Parcel** as Marcus ROSU DOB: February 28, 1981 associated to phone number (424) 382-8939. A search of "CLEAR" (a law enforcement intelligence clearinghouse) for "(424) 382-8939" showed it belonged to a "Marcus Rosu" at address 1400 Bristol St., Costa Mesa, CA 92626.

14. A March 13, 2020, CrimeDex search (an online community of financial institution fraud, loss prevention and law enforcement personnel) of Marcus ROSU revealed that ROSU had attempted to emplace an ATM skimmer at a Navy Federal Credit Union (FCU) in Groton Town, Connecticut in October 2019. I contacted Groton Town Police who provided their case reports and video from the October interaction including a copy of ROSU's Romanian passport #05679355. Groton Town Police detectives also provided information showing ROSU's previous ATM skimming history in both the United Kingdom and Australia.

15. On March 24, 2020 an Alaska state search warrant was served on ROSU's Wells Fargo bank account. On April 23, 2020 the search warrant was completed by Wells Fargo and provided to AST Investigator Jacobson. The investigation at this point showed ROSU conducting frequent trips to Anchorage for ATM cash-outs (the term for withdrawing funds from victimized accountholders using cloned cards). The Wells Fargo bank records showed a history of ROSU making multiple cash deposits of $300-$600 dollars at Wells Fargo locations in Alaska, and then withdrawing those funds from his Wells Fargo account using multiple transactions around $4,000 in southern California. Photos provided by Wells Fargo show ROSU as the only individual depositing or withdrawing cash from his accounts. ROSU's deposits and withdrawals of large amounts of cash in small quantities is indicative of structuring to avoid Bank Secrecy Act reporting requirements.

16. Wells Fargo bank records show from August 31 – September 2, 2019, ROSU made 39 cash deposits at Alaska Wells Fargo branches into his Wells Fargo account totaling $38,270. ROSU subsequently made three cash withdrawals totaling $30,000 cash in southern California.

17. Wells Fargo bank records show from September 21 – 25, 2019, Rosu made 74 cash deposits at Alaska Wells Fargo branches into his Wells Fargo account totaling $50,680. ROSU subsequently made 10 cash withdrawals totaling $45,000 in southern California.

//

//


Jul 13 2020

18. Wells Fargo bank records show from December 12 -17, 2019, Rosu made 50 cash deposits at Alaska Wells Fargo branches into his Wells Fargo account totaling $29,140. ROSU subsequently made 6 cash withdrawals totaling $23,500 in southern California.

19. Wells Fargo bank records show that from February 13 – 19, 2020, Rosu made 74 cash deposits at Alaska Wells Fargo branches between $360 and $600 dollars for a total of $43,480 into his Wells Fargo account. Rosu subsequently made 7 cash withdrawals totaling $28,000 in southern California.

20. National rental car records indicated that ROSU rented a vehicle from the Anchorage International Airport from March 19 - 26, 2020. Wells Fargo records show from March 22 – 23, 2020, ROSU made 34 cash deposits at Alaska Wells Fargo branches into his Wells Fargo account totaling $19,700. ROSU subsequently made five cash withdrawals totaling $20,000 cash in southern California. Northrim Bank provided video ATM transactions in March 2020 that showed an individual resembling Rosu, making withdrawals from Northrim ATMs using up to 12 different cards consecutively.

21. The Wells Fargo bank records show that in total, ROSU made $181,270 in cash deposits into his Wells Fargo account from August 2019 through March 2020.

22. A request to Interpol showed ROSU's criminal history dating back to 2000 in Great Britain. Interpol and various law enforcement agencies showed that ROSU has used at least 12 aliases and 8 different dates of birth. Information from the Victoria Police in Australia confirmed that ROSU (using the name Catalin Zamfirescu) was arrested on September 9, 2010 for Conspiracy to Defraud related to card skimming offenses and was


Jul 13 2020

sentenced to 5 years on September 26, 2011. He left Australia on September 23, 2014 after serving several years in jail.

23. On April 13, 2020, I received the Alaska Crime lab report of fingerprint evaluation of **the Subject Parcel.** The Alaska Crime Lab identified multiple latent prints on **the Subject Parcel,** which matched fingerprints for ROSU.

24. Responding to AST Investigator Jacobson's CrimeDex post about Rosu, Investigator Jacobson and I were contacted by FBI Special Agent Ben Glynn regarding ROSU's previous ATM skimming associated to Detroit, MI. SA Glynn provided AST Investigator Jacobson a phone number believed to be associated to ROSU "(323) 333-7237." A search of "CLEAR" for "(323) 333-7237" did not provide any results. AST Investigator Jacobson served an Alaska State search warrant on (323) 333-7237 for tolls and call records. (323) 333-7237 came back to "Sebastian Blason" at address "111 NO, Anaheim, CA 92801." A search of "CLEAR" for "Sebastian Blason" did not provide any results. Based upon my training and experience "Sebastian Blason" is most likely another alias being utilized by ROSU.

25. On May 13, 2020, AST and Inspectors were alerted to a potential ATM skimmer operating in Anchorage, AK. Working with fraud investigators from multiple credit unions it appears likely that during the week of May 4 – 8, 2020, two skimming devices were installed at USPS self-service kiosks in the W. Northern Lights and Lake Otis post offices in Anchorage. Customer cards from multiple Alaska financial institutions were compromised and cashed-out at AlaskaUSA ATMs across Anchorage withdrawing approximately $23,000.00 from May 12 – 18, 2020. Rental car records indicate that



Jul 13 2020

ROSU left Alaska on May 19, 2020 and returned to southern California. Images provided by local credit unions show ROSU in Alaska. Images retrieved from some of the ATMs indicate an individual matching ROSU's description and mannerism's but do not show his uncovered face because the individual depicted is wearing a mask.

26. On May 27, 2020, US Customs and Border Patrol (CBP) provided records that ROSU entered Canada through Vancouver International Airport on January 18, 2019 from Bucharest, Romania via Paris, France using Romanian passport #: 056793555. CBP did not have a record of ROSU entering the United States legally following that international travel.

27. On June 2, 2020, I received records from Verizon wireless for (424) 382-8939. Subscriber information for (424) 382-8939 came back to "Sebastian Zamof" at address "530 N Market Street, Redding, CA 96003." A search of "CLEAR" for "Sebastian Zamof" did not provide any results. Based upon my training and experience "Sebastian Zamof" is most likely another alias being utilized by ROSU.

28. On June 16, 2020, I received the Alaska Crime lab report for ROSU's fingerprint re-evaluation of **the Subject Parcel** using the fingerprint cards provided by Australian authorities under one of ROSU's aliases "Caitlin Zamfirescu." The re-evaluation identified additional latent fingerprints on **the Subject Parcel** that were a match to ROSU.

29. On July 9, 2020, I was alerted by MVFCU personnel about a potential ATM skimmer being used on an MVFCU branch ATM in Willow, AK. An MVFCU employee identified the individual at the Willow branch ATM shortly after 0700 in the morning,

with no car parked in the parking lot the MVFCU employee found this behavior suspicious. The MVFCU employee said that is not really a place where people do a lot of walking. The MVFCU employee saw the individual walk to a bicycle and took a photo of him. When the MVFCU employee left the area they were unable to see which way the individual went, and the MVFCU employee could not locate them. MVFCU conducted a review of the ATM footage and found that a suspected skimming device had been installed first on July 8, 2020 at 0116 hours. I reviewed some of the photos and video provided by MVFCU personnel which matched ROSU's description and mannerisms but did not show his uncovered face because the individual depicted was wearing a mask. The individual then used a device to obscure the camera lens of the Willow branch ATM. MVFCU video shows that the device was subsequently removed around 2100 hours on July 8, 2020.

30. Further review of the MVFCU video showed the same style device being installed on the ATM at 0711 hours on July 9, 2020. After the MVFCU employee identified the suspected ATM skimmer and drove off, the individual returned to the ATM and removed the device.

31. On July 9, 2020 I responded to the location and identified a sticky substance on the Willow branch ATM camera window where the obstruction had been placed. I recovered receipts and balled up tape in the trash can next to the ATM. I attempted to find the individual from the MVFCU video, whom I believed was ROSU, in Willow, Big Lake, and Palmer but was unable to locate.

32. On July 10, 2020, I requested AST Investigator Jacobson place a subject locator in the Alaska Public Safety Information Network (APSIN) to detain ROSU for questioning regarding the ATM skimmer if contacted by law enforcement in Alaska. Ted Stevens International Airport Police Department was then contacted and provided photos and a description of ROSU if he tried to leave the state via the airport.

33. On July 11, 2020, I was contacted by the Ted Stevens International Airport Police Department who stated that they had ROSU detained in their interview room. I responded to the Ted Stevens International Airport and made contact with Airport Police officers who explained that ROSU had returned to Enterprise rent-a-car, but rather than turning in the car, ROSU wanted to exchange it for another car. Enterprise denied his request and ROSU caused a disturbance which led to the Airport Police responding, identifying and detaining ROSU. Following his detention Airport Police officers secured the rental vehicle that ROSU was returning. I could observe from the outside of the vehicle the bicycle that ROSU was seen with in the MVFCU photo. I searched the rental vehicle incident to arrest and with permission of Enterprise, the registered owner of the vehicle. Located on the console of the truck was a Best Western magnetic strip key card. AST Investigator Jacobson contacted the Best Western Golden Lion Hotel in Anchorage who confirmed that ROSU was staying at the hotel but had checked in under the name "Marcus Katarlin." Following the search of the vehicle Inspectors met with ROSU in the Ted Stevens International Police Department interview room.

34. Inspector Brian Phillips and I identified ourselves and read ROSU his Miranda Rights and explained to ROSU that he was under arrest; ROSU declined to speak with us

Affidavit  Page 13 of 15
3:20-mj-373-MMS

and requested a lawyer, at that time the interview was terminated. Inspector Phillips and I placed ROSU into custody and transported him in my vehicle to the Anchorage Correctional Complex.

35. AST Investigator Jacobson obtained an Alaska state search warrant for ROSU's hotel room. Inspectors executed the search warrant at the Best Western Golden Lion Hotel room 304. In the ceiling tiles of the hotel room, Inspectors located a plastic bag containing three masking taped bundles of gold colored magnetic strip cards similar to the cards seized from **the Subject Parcel.** Additional items found in the hotel room's ceiling tiles were: approximately 1,000 blank gold colored magnetic strip cards, a laptop computer, and a bag of suspected ATM skimming components including a magnetic strip card reader / encoder.

36. Based on my training and experience in conducting this access device fraud investigation, I believe that credit card skimming affects interstate commerce. ROSU used a skimmer to steal the data from cards located in the State of California, transported them to Alaska in order to cash-out the funds from other financial institutions. Additionally, ROSU skimmed credit cards in the State of Alaska, many of which were issued by banks doing business outside the State of Alaska, including AlaskaUSA.

37. Knowingly and with intent to defraud having control or custody of a skimmer, counterfeit access device making equipment, is a violation of 18 U.S.C. § 1029(a)(4).

//

//

//



38. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
ALEXANDER LAUMB
U.S. POSTAL INSPECTOR
UNITED STATES POSTAL SERVICE

Sworn to telephonically and signed electronically.
this __13th__ day of July 2020.

_____
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
DISTRICT OF ALASKA